UNITED STATES DISTRICT COURT
DISTRICT OF CONNECTICUT

United States of America

*v.*

Albert Holland

Criminal No. 3:09cr139 (JBA)

July 22, 2010

RULING AND ORDER ON DEFENDANT'S MOTION TO SET ASIDE THE
VERDICT OR FOR JUDGMENT OF ACQUITTAL [Doc. # 75]

On April 15, 2010, a jury unanimously convicted Albert Holland of one count of

willful evasion of payment, in violation of 26 U.S.C. § 7201 (Count One), and two counts of

filing a false tax return, in violation of 26 U.S.C. § 7206(1) (Counts Two and Three).

Holland now moves for a new trial under Federal Rule of Criminal Procedure 33, which

provides that "the court may vacate any judgment and grant a new trial if the interest of

justice so requires," and for a judgment of acquittal under Rule 29, which requires entry of

a judgment of acquittal where "the evidence is insufficient to sustain a conviction."  For the

reasons that follow, Holland's motion will be denied.

"A Rule 29 motion should be granted only if the district court concludes there is no

evidence upon which a reasonable mind might fairly conclude guilt beyond a reasonable

doubt."  *United States v. Irving*, 452 F.3d 110, 117 (2d Cir. 2006) (internal quotations

omitted).  A Rule 33 motion should be granted only "in 'the most extraordinary

circumstances,'" and must be denied unless there is "'a real concern that an innocent person

may have been convicted.'"  *United States v. Ferguson*, 246 F.3d 129, 134 (2d Cir. 2001)

(quoting *United States v. Sanchez*, 969 F.2d 1409, 1414 (2d Cir. 1992)).  "Generally, the trial

court has broader discretion to grant a new trial under Rule 33 than to grant a motion for acquittal under Rule 29." *Id.*; *accord, e.g., United States v. Bell*, 584 F.3d 478, 483–84 (2d Cir. 2009) (same, and also quoting *Sanchez*, 969 F.2d at 1414).

In the 1990s Holland formed, with Mark Holod, an entity called REARS (Real Estate Asset Recovery Services); Holland and Holod were its partners. Both Holod and his attorney, James Donahue, testified at trial. Eventually REARS entered into a relationship with AMS (Active Media Services) under which Holod and Holland became AMS employees. In 1997 Holod was fired, and on behalf of REARS he brought a state–court lawsuit in New York against AMS for what REARS alleged was compensation owed to it. Because Holland remained an employee of AMS but also had, as a REARS partner, an interest in REARS's recovery in the lawsuit, Holland was only peripherally involved in the lawsuit. AMS made settlement offers to REARS in 1998 and disputed only the amount owed, not the existence of a debt. No settlement having been reached, the REARS–AMS lawsuit continued until September 2009, when REARS won the suit and damages were set at approximately $4.66 million.

Holland first argues that the evidence showed that he transferred to his children his interest in REARS in August 1998. The trial evidence contains a hand–written note, in Holland's handwriting, purporting to effectuate such a transfer. The Transfer Letter was addressed to Holod and contains the signatures of Holland's four children; next to each signature is the date August 8, 1998. Taken in the light most favorable to the Government,

2

however, the evidence also shows that one child (Watson) did not date his signature and that another child (Jonathan) could not recall dating his signature. Neither Watson nor Jonathan identified the handwriting of the date as his own, and no signatory to the letter except Holland testified that the letter was actually signed on August 8, 1998. Holland sent the Transfer Letter to Holod, care of Holod's attorney Donahue, postmarked 13 months later, in September 1999—just after REARS prevailed in the REARS–AMS lawsuit. The Government's theory at trial was that Holland transferred his REARS interests to his children in an attempt to conceal from the IRS the nature and extent of his assets. Asserting that August 8, 1998—the signature date—was the effective date of the transfer of his REARS shares to his children, Holland argues that the REARS shares were worthless in August 1998, and thus the transfer could not have been for the purpose of concealing any assets, since the "assets" were worthless. Holland further argues that the Government "put on no evidence as to the value of REARS" and called no "experts to attest to what those shares were worth." (Def.'s Mem. Supp. at 3.)

First, Holland's argument is wrong on the evidence, which for Rule 29 purposes must be "view[ed] . . . in the light most favorable to the government, drawing all inferences in the government's favor and deferring to the jury's assessments of the witnesses' credibility." *United States v. Sabhnani*, 599 F.3d 215, 241 (2d Cir. 2010). In light of the September 1999 postmark and the children's disclaiming that the dating of their signatures was in their handwriting, a jury could certainly reasonably believe that Holland drafted the Transfer

Letter in September 1999, had his children sign it, and then backdated it before sending it to Holod care of Donahue. Similarly, a jury could also reasonably find not credible Holland's testimony that after the Transfer Letter was drafted and signed in August 1998, he kept it in his desk drawer for 13 months because he did not trust Holod, but thereafter sent it to him right after REARS won its lawsuit against AMS. By September 1999, the shares undoubtedly held substantial value, *i.e.*, Holland's share of the $4.66 million judgment, less costs and fees.

Second, even assuming that the transfer actually occurred in 1998, Holland's argument is wrong that "[t]he [G]overnment produced no evidence that in 1998 when Mr. Holland divested himself of his shares in REARS that they had any value." (Def.'s Mem. Supp. at 3.) Donahue testified that a cause of action has value even before a party brings a lawsuit under that cause of action, and further that causes of action may be assigned or sold for value. This testimony supports a reasonable jury's conclusion that REARS's cause of action had value—even if the exact value was unknown—at the inception of the REARS–AMS lawsuit, even before REARS prevailed. Moreover, as the Government points out, the evidence—in particular, the testimony of the wine seller Ira Smith, who testified about his conversations with Holland, and the testimony of Jonathan and Watson Holland, who testified that Holland expected REARS to prevail and thus his share in REARS (and his share of REARS's recovery in the lawsuit) to be valuable—supports a reasonable jury's

4

conclusion that Holland *knew* that the REARS–AMS lawsuit represented substantial value, even before REARS actually prevailed for a sum certain.

If, as the evidence taken in the light most favorable to the Government shows, Holland drafted a backdated Transfer Letter in September 1999, after REARS prevailed in the REARS–AMS lawsuit, then the Government has proved that Holland transferred an asset to his children that had, and was known to have, a substantial value. Conversely, even if the jury concluded that the Transfer Letter had actually been signed on August 8, 1998, before REARS prevailed in the REARS–AMS lawsuit, the jury could still reasonably conclude that Holland transferred to his children assets that he knew to be valuable.

The fact that, as Theresa D'Alton testified, people often purchase real estate in the name of an LLC for management or tax–management purposes, does not render unreasonable the jury's conclusion that Holland used Jawbone LLC as a real–estate–purchasing vehicle for the purpose of concealing his assets from the IRS. Indeed, particularly if, as the evidence taken in the Government's favor suggests, the jury concluded that Holland backdated the Transfer Letter by 13 months after REARS prevailed in the lawsuit, the jury could also reasonably conclude that he used Jawbone for the same purpose of concealing his assets from the IRS. This reasonable conclusion is also supported by evidence showing that Holland held himself out as the "owner" of the house to contractors and other vendors and exercised total control over the expenditures of Jawbone's funds even though one of his children technically held check–writing responsibilities.

Holland next argues that his convictions on Counts Two and Three, for filing false tax returns for calendar years 2002 and 2003, cannot stand because to convict him on those counts the jury must have believed that Holland was "stupid" or did something that an "intelligent man" would not do—namely, claim zero income on his tax return when he knew that the 1099 Form that AMS would file directly with the IRS stated that Holland had earned $115,000 in income. (Def.'s Mem. Supp. at 4–5.) This is, in essence, an argument that only stupid or unintelligent people commit the crime of filing false tax returns, and as such can be rejected on its face as not providing a ground for acquittal or a new trial, since the Court must defer to the jury's determination of the testifying defendant's (and all witnesses') credibility. *See, e.g.*, *Bell*, 584 F.3d at 483 ("'It is well established that trial courts must defer to the jury's resolution of the weight of the evidence and the credibility of the witnesses.'" (quoting *Sanchez*, 969 F.2d at 1414)). In any event, even assuming Holland to be an "intelligent man," the jury could reasonably have discredited Holland's testimony that he reasonably believed the $115,000 represented a multi–installment loan from AMS rather than income in the form of a draw on commissions, particularly in light of the testimony of Holland's CPA Daniel Pannese that Holland failed to tell him about the AMS 1099 and specifically directed him to file a tax return reporting zero income. Holland has not "demonstrated" that this case presents the "exceptional circumstance[]" in which the Court "may intrude upon the jury function of credibility assessment." *See id.*

6

Holland next argues that the misstatements on his tax returns—*i.e.*, that he earned

no income in 2002 or 2003—were not "material" because the IRS also received the 1099 from

AMS showing $115,000 in taxable income, and therefore Holland's inaccurate statement of

his income was not "'capable of influencing or impeding the IRS in verifying or auditing the

tax return in question.'" (Def.'s Mem. Supp. at 5 (quoting *United States v. Bok*, 156 F.3d 157,

164–65 (2d Cir. 1998), for the definition of "material").) The Second Circuit has stated both

that "[t]he materiality of a false statement is determined by its potential to 'influenc[e] or

imped[e] the IRS in verifying' the return, not the total amount of loss," *United States v.*

*Triumph*, 266 F. App'x 53, 56 (2d Cir. 2008) (quoting *Bok*, 156 F.3d at 164–65; first alteration

added), and also that "[a] false statement is 'material' when it has 'the potential for hindering

the IRS's efforts to monitor and verify the tax liability' of . . . the taxpayer," *United States v.*

*Pirro*, 212 F.3d 86, 89 (2d Cir. 2000) (internal quotation omitted).

Judged under either standard, Holland's misstatement of his income as zero instead

of $115,000 is "material" because unless the IRS compared his return to the AMS 1099 and

spent effort verifying the accuracy of the AMS 1099, it would have assessed Holland an

income tax due and owing of zero. Although IRS employees eventually discovered Holland's

misstatements through investigation, that does not eliminate the "potential" of Holland's

misstatements to hinder, influence, or impede the IRS's efforts to verify the accuracy of his

tax return or tax liability. Holland's argument that "the return in a sense was not material

because it had no likelihood and was not 'capable of influencing or impeding the IRS'"

7

(Def.'s Mem. Supp. at 6 (quoting *Bok*, 156 F.3d at 164–65)) is simply factually incorrect, since it assumes that a discrepancy between two documents purporting to report a taxpayer's income, only one of which is accurate, will *never* hold the potential to impede, influence, or hinder the IRS's efforts to verify the accuracy of a tax return or the liability of a taxpayer. Holland points to no evidentiary basis, and no basis in law, for this assumption, and it is rejected.

Finally, Holland argues that the Government's rebuttal summation—in which the Government observed the date of summation and deliberation (April 15, 2010, the due–date for income tax returns to be filed with the IRS) and noted that in contrast to Holland, millions of Americans would pay their taxes by that day—resulted in prejudice requiring acquittal or a new trial. Specifically, counsel for the Government stated in her summation that "[n]ow, ladies and gentlemen, today, on tax day, millions of hardworking Americans are filing their taxes because they believe in playing by the rules," implicitly drawing a comparison with Holland, who impliedly did not "fil[e] [his] taxes" or "play[] by the rules." Counsel for Holland objected, and after colloquy with counsel, the Court issued the following curative instruction upon the jury's return to the courtroom:

> The Government referenced in its rebuttal closing that today is tax day and hardworking Americans are paying their taxes. I want to make sure you understand and keep firmly in mind that it is irrelevant that today is tax day. Your decision will be made on the basis of the evidence, whether it is January 1st or February 8th or whatever day it is.

Holland's argument, which asserts prosecutorial misconduct, is unpersuasive. "'Inappropriate prosecutorial comments, standing alone, would not justify a reviewing court to reverse a criminal conviction obtained in an otherwise fair proceeding.'" *United States v. Elias*, 285 F.3d 183, 190 (2d Cir. 2002) (quoting *United States v. Young*, 470 U.S. 1, 11–12 (1985)). "Remarks of the prosecutor in summation do not amount to a denial of due process unless they constitute egregious misconduct," and "[t]o warrant reversal, the prosecutorial misconduct must cause the defendant substantial prejudice by so infecting the trial with unfairness as to make the resulting conviction a denial of due process." *Id.* (internal quotations omitted). "In assessing whether prosecutorial misconduct caused 'substantial prejudice,' [the Second Circuit] has adopted a three–part test: the severity of the misconduct, the measures adopted to cure the misconduct, and the certainty of conviction absent the misconduct." *Id.*

Even assuming that the rebuttal–summation comment was improper, there is no risk that Holland suffered substantial prejudice from that comment. First, the April 15th comment was not severe; it was a single, isolated comment, and Holland does not assert any other misconduct involved in any part of the trial, including the Government's summation or any part of its rebuttal other than the comment itself. A single, isolated comment is not generally considered severe. *See United States v. Whitten*, --- F.3d ----, 2010 WL 2595315 (2d Cir. June 30, 2010) (prosecutorial misconduct did not warrant reversal of conviction or death–penalty sentence where prosecutor "castigated defense counsel for [i] presenting the mitigating evidence, and [ii] shifting the blame for the murders to the victims and others," because "misconduct (if any) could not be deemed severe," particularly in light of prior circuit case–law "cautioning against 'disproportionate emphasis [on] isolated incidents of

9

alleged error'" (quoting *United States v. Newton*, 369 F.3d 659, 681 (2d Cir. 2004)), and noting that "'[t]he severity of the misconduct is mitigated if the misconduct is an aberration in an otherwise fair proceeding'" (quoting *Elias*, 285 F.3d at 191)); *United States v. Rahim*, 339 F. App'x 19, 24 (2d Cir. 2009) ("Given the very specific nature of the curative instruction and the isolated nature of the comment, reversal is not required."); *United States v. Thomas*, 377 F.3d 232, 245 (2d Cir. 2004) ("The 'severity of the misconduct is mitigated if the misconduct is an aberration in an otherwise fair proceeding.' The alleged misconduct, if any, was not severe in this case. Thomas objects to the use of one word in the prosecution's summation. The opening statement and the prosecutor's conduct throughout the rest of the trial is unchallenged. The prosecution only used the word twice and immediately stopped when warned by the district court." (quoting *Elias*, 285 F.3d at 191));

Second, and most importantly, the Court, on Holland's motion, issued a curative instruction to the jury to disregard the Government's reference to April 15th or the fact that Americans pay tax on that day. Prejudice of the type Holland claims—which, on Holland's telling, asks the jury to consider a fact not in evidence or, perhaps, to consider emotions rather than the evidence—"can be cured with proper instructions, and 'juries are presumed to follow their instructions.'" *Zafiro v. United States*, 506 U.S. 534, 540–41 (1993) (quoting *Richardson v. Marsh*, 481 U.S. 200, 211 (1987)); *see also Cusamano v. Donelli*, No. 06 Civ. 6047(PAC)(THK), 2007 WL 72116166, *18 (S.D.N.Y. Dec. 19, 2007) (applying, on habeas review, *Zafiro* presumption to Second Circuit's three–part test for prosecutorial misconduct in context of allegedly improper comment during summation in state–court criminal trial). Holland proffers no evidence or argument disturbing the presumption that the jury followed the Court's limiting instruction. Recognizing the Court's curative instruction, Holland

argues that the instruction did not "tell the jury to disregard the remarks entirely[,] including the play to the jury's emotions since they were hard–working people who have paid their taxes." (Def.'s Mem. Supp. at 8.) First, the comment was not directed to the jurors as jurors, and did not particularly play on their emotions, since the comment referenced that their deliberation date was the due–date for all Americans, not only the jurors, to pay taxes, and was not emotionally inflammatory. Second, even if the comment played to the emotions of the jurors as taxpayers, the Court issued a curative instruction as to the comment as well as other instructions—including after the Government's rebuttal–summation—which focused the jurors generally to their task and responsibility. *See, e.g.*, *Rahim*, 339 F. App'x at 24 (no reversal on basis of "allegedly improper comments made by the Assistant United States Attorney during his rebuttal summation" in securities fraud conspiracy case that defendant "hit the jackpot nine times" and "victimize[d] the people who have 401Ks and pension plans that are invested in the stock market," because district court "very quickly" issued curative instruction; and holding that "[g]iven the very specific nature of the curative instruction and the isolated nature of the comment, reversal is not required"); *Thomas*, 377 F.3d at 245 (holding no substantial prejudice where judge "provided an immediate curative instruction," and noting that in *Elias* the Second Circuit held that "when misconduct is not severe, pattern instruction on statements of counsel may help mitigate impact" (citing *Elias*, 285 F.3d at 192)). In this case, not only did the Court immediately issue a curative instruction, but it also issued instructions to the jurors orally and in writing that "[w]hat the lawyers have said in their questions, in their objections, or what they may say in closing arguments, is not evidence," that "[a]rguments or statements by lawyers are not evidence because the lawyers are not witnesses and have no personal knowledge of the facts in this case or whether

11

witnesses were testifying truthfully or not," and, after summations, that the jurors "are the judges of the facts and [their] sole interest is to seek the truth from the evidence in the case."

And third, as the preceding discussion makes clear, the evidence strongly supported Holland's conviction even absent the Government's April 15th comment; the evidence and proceedings at trial leave little doubt that absent the Government's comment, Holland would have been convicted. *See Elias*, 285 F.3d at 192 (explaining that "[t]his factor weighs heavily in favor of the government" because "[t]o prevail" on a prosecutorial–misconduct claim, a defendant must "show that, absent the isolated impropriety of the prosecutor in rebuttal summation (taken in the context of the entire trial), [a defendant] would not have been convicted"; and holding that the factor did not weigh in favor of the defendant where "[t]he specific remarks at issue did not touch upon or bolster the most potent of the government's evidence"); *compare also, e.g.*, *Cusamano*, 2007 WL 7216166, at *18 (full discussion of third factor being "Here, the proof adduced at trial against Petitioner, including the testimony of Bensalem and the police officers, as well as the merchandise and screwdrivers recovered from his person at the crime scene, was sufficiently strong that there is little doubt that the jury would have found Petitioner guilty even absent the challenged comments made by the prosecutor."); *Sierra v. Burge*, No. 06 Civ. 14432 (DC), 2007 WL 4218926, *10 (S.D.N.Y. Nov. 30, 2007) ("In the absence of the comments by the prosecutor, it is clear that a sufficient basis for the conviction existed in the record.").

In short, there is no "interest of justice," *see* Fed. R. Crim. P. 33, that requires a new trial, and there is sufficient evidence to sustain Holland's conviction, *see* Fed. R. Crim. P. 29. Holland has not shown a lack of "evidence upon which a reasonable mind might fairly conclude guilt beyond a reasonable doubt," *Irving*, 452 F.3d at 117 (Fed. R. Crim. P. 29), or

any "real concern that an innocent person may have been convicted,'" *Ferguson*, 246 F.3d at 134 (Fed. R. Crim. P. 33).

For the reasons stated above, Holland's Motion to Set Aside the Verdict and for Judgment of Acquittal [Doc. # 75] is DENIED.

IT IS SO ORDERED.

_____/s/_____
Janet Bond Arterton, U.S.D.J.

Dated at New Haven, Connecticut this 22d day of July, 2010.

13